FILED
2021 May-28  AM 09:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **AMANDA DOUGLAS,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **4:20-cv-00822-CLM** |
| | ) | |
| **ANDREW SAUL,** | ) | |
| **Commissioner of the Social** | ) | |
| **Security Administration,** | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Amanda Douglas seeks disability, disability insurance, and Supplemental Security Income ("SSI") from the Social Security Administration ("SSA") based on several impairments. The SSA denied Douglas's application in an opinion written by an Administrative Law Judge ("ALJ").

Douglas argues: (1) the ALJ failed to afford proper weight to the opinions of two treating physicians; (2) the ALJ erred in analyzing her daily life activities; (3) the ALJ failed to properly consider Douglas's subjective testimony about her medication side effects; and (4) the ALJ improperly relied on her part-time work to deny benefits.

As detailed below, the ALJ applied the correct legal standards and substantial evidence supports her decision. So the court will **AFFIRM** the SSA's denial of benefits.

1

## I.   Statement of the Case

### A.   Douglas's Disability, as told to the ALJ

Douglas was 41 years old at the time of the ALJ's decision. R. 217, 1596. Douglas has a high school education and past relevant work as an assistant store manager and pharmacy technician. R. 283, 44.

At the ALJ hearing, Douglas testified that she suffers from chronic migraines; fibromyalgia; neuropathy; arthritis in her neck, back, hips, and knees; depression; and anxiety. R. 36. Douglas said that her migraines impair her vision and that her fibromyalgia keeps her up at night. *Id.* She also stated that her fibromyalgia causes her all-over pain, weakness, and fatigue and exacerbates the pain from the osteoarthritis in her neck, back, spine, hips, knees, and ankles. R. 36–37. Douglas then told the ALJ that because of her anxiety she can't be around crowds and that her depression makes her not "even want to get out of bed on some days." R. 38.

Douglas worked part time at Farmers Furniture in Gadsden until April 2019. R. 35. Now, Douglas spends most days at home watching television. R. 41. Because she cannot sit still for very long, she will sometimes lay down or walk around the house. *Id.* Unless she is "down with a migraine or neuropathy," Douglas can do her own grocery shopping, banking, and personal errands. R. 39. And Douglas drives three or four days a week. *Id.* But Douglas's roommate usually makes Douglas's bed and cleans the bathroom because it requires bending. R. 40.

2

**B.     Determining Disability**

The SSA has created the following five-step process to determine whether an individual is disabled and thus entitled to benefits under the Social Security Act:

| The 5-Step Test | | |
|---|---|---|
| Step 1 | Is the Claimant engaged in substantial gainful activity? | If yes, claim denied. If no, proceed to Step 2. |
| Step 2 | Does the Claimant suffer from a severe, medically-determinable impairment or combination of impairments? | If no, claim denied. If yes, proceed to Step 3. |
| Step 3 | Does the Step 2 impairment meet the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appx. 1? | If yes, claim granted. If no, proceed to Step 4. |
| | *Determine Residual Functional Capacity* | |
| Step 4 | Does the Claimant possess the residual functional capacity to perform the requirements of his past relevant work? | If yes, claim denied. If no, proceed to Step 5. |
| Step 5 | Is the Claimant able to do any other work considering his residual functional capacity, age, education, and work experience? | If yes, claim denied. If no, claim granted. |

*See* 20 C.F.R. §§ 404.1520(a), 404.1520(b) (Step 1); 20 C.F.R. § 404.1520(c) (Step 2); 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526 (Step 3); 20 C.F.R. § 404.1520(e-f) (Step 4); 20 C.F.R. § 404.1520(g) (Step 5). As shown by the gray-shaded box, there is an intermediate step between Steps 3 and 4 that requires the ALJ to determine a claimant's "residual functional capacity," which is the claimant's ability to perform physical and mental work activities on a sustained basis. The intermediate step of

determining Douglas's residual functional capacity is the most important step here, as all of Douglas's challenges flow from the ALJ's decision at this juncture.

### C.   Douglas's Application and the ALJ's Decision

The SSA reviews applications for disability benefits in three stages: (1) initial determination, including reconsideration; (2) review by an ALJ; and (3) review by the SSA Appeals Council. *See* 20 C.F.R. § 404.900(a)(1-4).

Douglas applied for disability insurance benefits, a period of disability, and SSI in October 2017, claiming that she was unable to work because of various ailments, including migraines; fibromyalgia; cervical spine degenerative disc disease, status post C4 anterior cervical discectomy and fusion; lumbar spine degenerative disc disease; bilateral knee osteoarthritis; bilateral hip osteoarthritis; COPD; obesity; major depressive disorder, severe, recurrent without psychosis; obsessive compulsive disorder; generalized anxiety disorder; carpal tunnel syndrome; diabetes mellitus type II; and hypertension. After receiving an initial denial in December 2017, Douglas requested a hearing, which the ALJ conducted in July 2019. The ALJ ultimately issued an opinion denying Douglas's claims in November 2019. R. 1576–96.

At Step 1, the ALJ determined that although Douglas worked part-time for Farmers Furniture after her alleged disability onset date, she was not engaged in substantial gainful activity and thus her claims would progress to Step 2. R. 1578.

4

At Step 2, the ALJ determined that Douglas suffered from the following severe impairments: migraines; fibromyalgia; cervical spine degenerative disc disease, status post C4 anterior cervical discectomy and fusion; lumbar spine degenerative disc disease; bilateral knee osteoarthritis; bilateral hip osteoarthritis; COPD; obesity; major depressive disorder, severe, recurrent without psychosis; obsessive compulsive disorder; and generalized anxiety disorder. R. 1579–81.

At Step 3, the ALJ found that none of Douglas's impairments, individually or combined, met or equaled the severity of any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. R. 1581–84. Thus, the ALJ next had to determine Douglas's residual functional capacity.

The ALJ determined that Douglas had the residual functional capacity to perform light work with these added limitations:

- Douglas can lift 20 pounds occasionally and 10 pounds frequently;

- Douglas can carry 20 pounds occasionally and 10 pounds frequently;

- Douglas can sit for six hours, stand for six hours, and walk for six hours;

- Douglas can push and/or pull as much as she can lift and carry;

- Douglas can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl;

- Douglas can never reach overhead with her bilateral upper extremities;

- Douglas can tolerate occasional exposure to extreme cold, extreme heat, and dust, odors, fumes, and pulmonary irritants;

- Douglas can never work at unprotected heights or around moving mechanical parts;

- Douglas can perform simple, routine tasks, and can make simple work-related decisions;

- Douglas can have occasional contact with the general public.

R. 1584–94.

At Step 4, the ALJ found that Douglas could not perform her past relevant work. R. 1595. At Step 5, the ALJ determined that Douglas could perform jobs, such as office helper, inspector/hand packager, and marker, that exist in significant numbers in the national economy and thus Douglas was not disabled under the Social Security Act. R. 1595–96.

Douglas requested an Appeals Council review of the ALJ's decision. R. 1–4. The Appeals Council will review an ALJ's decision for only a few reasons, and the Appeals Council found no such reason under the rules to review the ALJ's decision. As a result, the ALJ's decision became the final decision of the SSA Commissioner, and it is the decision subject to this court's review.

## II.    Standard of Review

This court's role in reviewing claims brought under the Social Security Act is a narrow one. The scope of the court's review is limited to (a) whether the record contains substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g);

*Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and (b) whether the ALJ applied the correct legal standards, *see Stone v. Comm'r of Soc. Sec.*, 544 F. App'x 839, 841 (11th Cir. 2013) (citing *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004)). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford*, 363 F.3d at 1158.

### III.   Legal Analysis

Douglas makes four arguments for why the ALJ erred in finding her not disabled. She first challenges the ALJ's evaluation of opinion evidence from her treating psychiatrist, Dr. Huma Khusro, and her treating neurologist, Dr. Gary Mellick. Douglas next argues that the ALJ erred by finding that her daily activities discounted her subjective pain testimony and her doctors' opinions. Douglas's third argument relates to the ALJ's handling of her testimony about her medication side effects. Finally, Douglas asserts that the ALJ erred in relying on her ability to perform part-time work to deny benefits. The court addresses each argument in turn.

### A.   Substantial evidence supports the ALJ's evaluation of the opinion evidence.

Douglas first asserts that the ALJ erred by not affording the opinions of her treating physicians, Dr. Khusro and Dr. Mellick, substantial or considerable weight absent good cause to disregard their opinions. But, as the Commissioner points out, the SSA has recently revised its regulations on the consideration of medical

opinions. Under the new regulations, an ALJ need not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)" for all claims filed on or after March 27, 2017. 20 CFR §§ 404.1520c(a), 416.920c(a).

In her reply brief, Douglas concedes that she applied for disability and SSI after March 27, 2017. But she argues that while the SSA's regulations no longer require an ALJ to defer to a treating physician's opinion, Eleventh Circuit precedent does. So before addressing the ALJ's specific findings, the court will discuss what legal framework governs the ALJ's evaluation of opinion evidence from Douglas's treating physicians.

1. Applicable legal framework: The Eleventh Circuit, like several other Courts of Appeals, developed the treating physician rule "as a means to control disability determinations by administrative law judges under the Social Security Act." *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 829 (2003). Under this rule, the Eleventh Circuit required ALJs to articulate good cause for discounting the opinion of a treating physician. *See Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). The SSA then formalized the treating physician rule in 1991, implementing regulations that required ALJs to "give more weight to medical opinions" from treating sources and to "give good reasons . . . for the weight . . . give[n] [a] treating source's medical opinion." *See* 20 CFR §§ 404.1527(c)(2), 416.927(c)(2).

The SSA's new regulations do away with the hierarchy of medical opinions and the treating physician rule. 20 CFR §§ 404.1520c(a), 416.920c(a). The SSA Commissioner has "full power and authority to make rules and regulations" related to the proof and evidence needed to establish a right to benefits under the Social Security Act. *See* 42 U.S.C. § 405(a). And "[a] court's prior judicial construction of a statute trumps an agency construction . . . only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Nat'l Cable Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005).

Here, the Social Security Act requires the Commissioner to "make every effort to obtain from [an] individual's treating physician . . . all medical evidence, including diagnostic tests, necessary in order to properly make [a disability] determination, prior to evaluating medical evidence obtained from any other source on a consultative basis." 42 U.S.C. §§ 423(d)(5)(B), 1382c(H)(i). But it does not specify how the SSA should evaluate treating source evidence. And Douglas has cited no case in which the Eleventh Circuit has held that the Social Security Act mandated the treating physician rule. Nor has Douglas asserted that the 2017 regulations are arbitrary, capricious, or otherwise invalid. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 845 (1984) (courts must defer to validly

adopted regulations). So the court will apply the 2017 regulations—not the treating physician rule—to the ALJ's evaluation of the opinion evidence.

Under the new regulations, an ALJ should focus on the persuasiveness of an opinion by looking at the opinion's supportability and consistency. *See* 20 CFR §§ 404.1520c(b)(2), 416.920c(b)(2). The ALJ may, but need not, explain how she considered other factors, such as the medical source's relationship with the claimant and specialization, when assessing a medical opinion. *See id.* "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinion(s) . . . will be." 20 CFR §§ 404.1520c(c)(1), 416.920c(c)(1). And "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." 20 CFR §§ 404.1520c(c)(2), 416.920c(c)(2).

2. <u>Dr. Khusro</u>: Dr. Khusro is Douglas's psychiatrist who filled out two mental health source statements in May 2018 and June 2019. In the May 2018 mental health source statement, Dr. Khusro responded that Douglas can understand, remember or carry out very short and simple instructions. R. 669. But she noted that while Douglas can sometimes maintain attention, concentration and/or pace for periods of at least two hours, it is other times "very hard" for Douglas to do so. *Id.* Dr. Khusro then stated that Douglas cannot perform activities within a schedule and be punctual

within customary tolerances but that she can sustain an ordinary routine without special supervision and adjust to routine and infrequent work changes. *Id.* Dr. Khusro also replied that Douglas can interact with co-workers but whether she can interact with supervisors "depends on the kind of interaction." *Id.* Dr. Khusro then answered that Douglas can maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, would be off task 50% of the time in an 8-hour day, and would likely miss at least 15 days of work in a 30-day period. *Id.* Finally, Dr. Khusro stated that Douglas's medications caused nausea, excessive sweating, and sedation. *Id.*

In the June 2019 mental health source statement, Dr. Khusro again stated that Douglas can understand, remember, or carry out very short and simple instructions. R. 1036. She then responded that whether Douglas can maintain attention, concentration and/or pace for periods of at least two hours depends on the activity. *Id.* As in May 2018, Dr. Khusro reported that Douglas cannot perform activities within a schedule and be punctual with customary tolerances. *Id.* And while Dr. Khusro said that Douglas can adjust to routine and infrequent work changes, she noted that it would "be very stressful for her." *Id.* Dr. Khusro then answered that Douglas's ability to interact with supervisors and co-workers depends on the nature of the interaction. *Id.* According to Dr. Khusro, Douglas "is likely to get overwhelmed easily and will have a hard time with anyone who is critical or

overbearing." *Id.* And Dr. Khusro again answered that Douglas can maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, would likely be off task at least 50% of the time in an 8-hour workday, and would likely miss at least 50% of workdays in a 30-day period. *Id.*

Dr. Khusro wrote at the bottom of the June 2019 mental health source statement that at Douglas's last job she missed at least 20 work days in a month. *Id.* She then stated that Douglas's mental and physical issues prevented her from being gainfully employed and that Douglas had to quit three previous jobs due to her poor health. R. 1036–37.

The ALJ found that "Dr. Khusro's opinions are unpersuasive as they are poorly supported and lacking in consistency, including with her own treating notes." R. 1592. The ALJ noted that Dr. Khusro "provided no support for her opinions other than listing the claimant's physical and mental conditions, and failed to explain why these conditions would result in the extreme limitations she opined." *Id.* The ALJ then cited Douglas's medical records and the evidence of her daily life activities and found that the limitations Dr. Khusro identified "are inconsistent with the conservative treatment she and her facility provided, ordering routine follow-ups and occasionally adjusting medications, and are also inconsistent with the mental status examinations she recorded." R. 1592–93.

12

Substantial evidence supports the ALJ's finding that Dr. Khusro's opinions were unpersuasive. As the ALJ noted, Dr. Khusro failed to explain why Douglas's conditions would cause the limitations that she identified. R. 669, 1036–37. And though Douglas argues that her CED Mental Health records support Dr. Khusro's opinions, it is not this court's function to "decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]." *Winschel*, 631 F.3d at 1178. The ALJ cited several aspects of Douglas's CED Mental Health records that conflict with the limitations Dr. Khusro reported. For example, the ALJ correctly observed that the doctors and therapists at CED provided Douglas with a conservative treatment plan, only at times adjusting her medications and ordering routine follow-up appointments. *See* R. 570–71, 713–19, 722–24, 726, 826–27, 830, 835–37.

The ALJ also recognized that Dr. Khusro's mental status examinations recorded decreased concentration. R. 567, 726. But she reasonably concluded that Dr. Khusro's findings that Douglas had fair/okay attention and grossly intact short-term and long-term memory conflicted with the expectation that Douglas would be off-task 50% of the time in an 8-hour day. *Id.* The ALJ then noted that another CED provider found that Douglas *had* adequate attention and concentration. R. 569. And as the ALJ stated, although Dr. Khusro said Douglas's medications cause nausea, excessive sweating, and sedation, her treatment notes from March 2019 state that

13

Douglas suffered from no medication side effects. R. 837. The court notes that Douglas did report in November 2017 that taking Latuda "made her sick to her stomach." R. 719. But Dr. Khusro reported that they fixed this issue by changing Douglas's medication and that the change in medication "is working well." *Id.*

The ALJ also pointed to evidence of Douglas's daily activities and examinations from other medical providers as conflicting with Dr. Khusro's opinions. For example, the ALJ stated evidence that Douglas could work part-time, keep multiple medical appointments, tend to her own personal care, and help take care of her roommate, R. 308–09, 40, 724, undermines Dr. Khusro's statements that Douglas cannot perform activities within a schedule, be punctual with customary tolerances, and is easily overwhelmed.

Having reviewed the CED medical records as well as the evidence that the ALJ said undermined Dr. Khusro's opinions, the court finds that a reasonable person could conclude, as the ALJ did, that Dr. Khusro's opinions lacked supportability and conflicted with the other record evidence. So substantial evidence supports the ALJ's decision to find Dr. Khusro's opinions unpersuasive.

3. <u>Dr. Mellick</u>: Dr. Mellick is Douglas's neurologist who filled out two physical capacities forms in May 2018 and June 2019. In the May 2018 physical capacities form, Dr. Mellick responded that Douglas can sit upright in a chair for less than 30 minutes at a time. R. 670. And he said that Douglas can stand for less

than 15 minutes at a time. *Id.* Dr. Mellick also reported that in an 8-hour daytime period, he would expect Douglas to need to be lying down, sleeping, or sitting with legs propped at waist level or above for 3 to 4 hours. *Id*. Dr. Mellick then stated that he would expect Douglas to be off-task 50% of the time in an 8-hour day and that she would likely miss 15 to 20 days of work in a 30-day period. *Id.* According to Dr. Mellick, Douglas's fibromyalgia, migraines, arthritis, and fatigue cause these limitations and a side effect of Douglas's medications was sleepiness. *Id.* Dr. Mellick's June 2019 physical capacities form identified these same limitations and added fatigue as a side effect of Douglas's medications. R. 1038.

The ALJ found that "Dr. Mellick's opinions are unpersuasive as they are poorly supported and lacking in consistency, including with his own treating notes." R. 1591. The ALJ noted that as sole support for the limitations he identified, Dr. Mellick listed Douglas's diagnoses. R. 1591. The ALJ then found that Dr. Mellick's opinions conflicted with much of the other record evidence. R. 1591–92. For example, the ALJ noted that Dr. Mellick's treatment notes contained no complaints of medication side effects. *Id.* And the ALJ found that Dr. Mellick's opinions contradicted his notes and examination findings from the days he completed the physical capacities forms. R. 1592. The ALJ also found that Dr. Mellick's opinions contradicted Douglas's "own statements of what she has been able to do despite such alleged pain." *Id.*

Douglas asserts that her treatment records from Dekalb Neurology (R. 604–65, 1039–1119) support Dr. Mellick's opinions. But Dr. Mellick did not explain what objective medical evidence supported the limitations identified in the physical capacities forms. R. 670, 1038. And Dr. Mellick's records from the days he filled out the physical capacities forms do not reflect the extreme limitations he identified. For example, on the day Dr. Mellick completed the first physical capacities form, Douglas reported that her headaches had improved and had decreased in frequency so that they were only occurring 1 to 3 times each month. R. 678. And on the day Dr. Mellick filled out the second physical capacities form, he recorded that Douglas was "doing well on medication" and that Aimovig was keeping her migraines calmer. R. 1114. That same day, Dr. Mellick's physical examination of Douglas revealed that Douglas had intact sensation, 5/5 motor strength in all muscle groups, normal tone, intact cranial nerves, and normal coordination. *Id.* As the ALJ noted, these findings matched other objective findings from the relevant period.

After reviewing Douglas's extensive treatment records, the court finds that the ALJ adequately justified her conclusion that Dr. Mellick's opinions were unpersuasive. In short, the court sees no error in the ALJ's evaluation of the opinion evidence from Dr. Mellick.

16

**B.     The ALJ did not err in analyzing Douglas's daily activities.**

Douglas next asserts that the ALJ improperly found that evidence of her daily activities diminished the persuasiveness of her allegations and discredited the opinions of her treating physicians. A claimant's admission that she participates in daily activities for short durations does not disqualify the claimant from disability, *Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997), but it is appropriate for an ALJ to consider daily activities relevant to a claimant's subjective pain allegations. *See* 20 CFR §§ 404.1529(c)(3)(i), 416.929(c)(3)(i). And "the opinion of a treating physician may be entitled to less weight when the physician's assessment conflicts with the claimant's own reported activities." *Mijenes v. Comm'r of Soc. Sec.*, 687 F. App'x 842, 847 (11th Cir. 2017) (citing *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004)).

Douglas mainly contends that the ALJ erred in relying on the following daily activities to discount Dr. Mellick's opinions: (1) Douglas drove 43 minutes to Dr. Mellick's office on a "bad headache" day; (2) Douglas helped care for her pregnant sister-in-law during a period in which her pain medications had not been titrated; (3) Douglas cared for her roommate; and (4) Douglas consistently reported engaging in moderate activity level. R. 1592. Record evidence supports the ALJ's finding that Douglas engaged in these activities. *See* R. 610, 620, 713, 724, 835, 775, 788, 794, 810, 819. And these daily activities cast doubt on Dr. Mellick's statements that

Douglas can sit upright for less than 30 minutes at a time; can stand for less than 15 minutes at a time; and would need to lie down, sleep, or sit with legs propped at waist level for 3 to 4 hours during an 8-hour period. So the ALJ did not err in finding that Douglas's daily activities, along with objective medical evidence, discredited Dr. Mellick's opinions.

Nor has Douglas shown that the ALJ erred when she pointed to Douglas's daily activities as one reason why she discounted Dr. Khusro's opinions and Douglas's subjective pain testimony. As discussed above, the ALJ found that Douglas's ability to work part-time, keep medical appointments, tend to her personal care, and take care of her roommate, contradicted Dr. Khusro's opinion that Douglas cannot perform activities within a schedule, cannot be punctual within customary tolerances, and is easily overwhelmed. R. 1593. A reasonable person could agree with the ALJ that Douglas's ability to perform these daily activities conflicted with the limitations Dr. Khusro identified.

A reasonable person could also agree that evidence of Douglas's daily activities discredited her subjective pain testimony. As recounted in the ALJ's hearing decision, Douglas testified at the ALJ hearing that no medications work for her migraines and that her fibromyalgia "causes allover pain, weakness, and fatigue." R. 1585. She also said that "[i]t hurts to sit back against a seat, and she has difficulty sleeping at night, because she can only lie down for so long." *Id.* And

18

Douglas stated that she can only walk 3 minutes, stand 2 minutes, sit 10 to 15 minutes, and lift items that are 5 pounds or less. *Id.* It was reasonable for the ALJ to conclude that Douglas's daily life activities, which included helping her pregnant sister-in-law, playing with dogs, engaging in a moderate activity level, taking care of her roommate, and often lifting 10 pounds and sometimes lifting 20 pounds at Farmers Furniture, discredited her subjective pain testimony. R. 1587–88. In sum, the ALJ properly pointed to Douglas's daily activities as one of several factors that supported her disability determination.

### C.   ALJ properly considered Douglas's subjective testimony about her medication side effects.

Douglas next argues that the ALJ failed to properly consider her subjective testimony about the side effects of her medications. "In determining whether a claimant's impairments limit her ability to work, the ALJ considers the claimant's subjective symptoms, which includes the effectiveness and side effects of any medications taken for those symptoms." *Walker v. Comm'r of Soc. Sec.*, 404 F. App'x 362, 366 (11th Cir. 2010). Under the Eleventh Circuit's two-step "pain standard," a claimant must first present "evidence of an underlying medical condition." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002). If she does, the claimant must then either: (a) present "objective medical evidence confirming the severity of the alleged pain," or (b) show "that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." *Id.*

When an ALJ refuses to credit the claimant's subjective pain testimony, "he must articulate explicit and adequate reasons" for doing so. *See Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987). And to fulfill her duty to adequately develop the record, an ALJ may need to elicit testimony and make findings "regarding the effect of [the claimant's] prescribed medications upon her ability to work." *See Cowart v. Schweiker*, 662 F.2d 731, 737 (11th Cir. 1981).

Though Douglas suggests otherwise, the ALJ considered Douglas's testimony about her medication side effects when making her credibility determination. As the ALJ noted, Douglas testified at the ALJ hearing that her medications caused sleepiness, foggy-headedness, and diarrhea. R. 1590, 43. But the ALJ found that Douglas's medical records reflected that she "complained of no medication side effects that were not alleviated by adjusting medication or dosage" and that Douglas "rarely, if ever, complained of medication side effects." R. 1590. So the ALJ found that the record evidence was not "entirely consistent with the intensity, persistence and limiting effects of the symptoms" Douglas alleged. R. 1586.

Douglas does not address the ALJ's factual findings about her medication side effects. Nor does Douglas explain why there isn't substantial evidence to support these findings. Douglas's medical records (Exhibits 4F, 5F, 6F, 13F, 14F, 15F, 29F, 33F, 36F, and 37F) do not show that the ALJ clearly erred when she found that Douglas rarely complained of medication side effects. And the side effects that

Douglas did complain of were allergic reactions to medication, nausea, and cough. R. 719, 836, 1149, 807, 814. As the ALJ noted, Douglas's doctors alleviated these side effects by adjusting her medications. R. 719, 814. And Douglas's treatment notes do not reflect that Douglas's doctors had serious concerns about side effects from her medications. So substantial evidence supports the ALJ's decision to discredit Douglas's testimony about her medication side effects. *See Swindle v. Sullivan*, 914 F.2d 222, 226 (11th Cir. 1990) (substantial evidence supported ALJ's determination that medication side effects did not present a significant problem when claimant did not complain of side effects and record did not disclose that doctors had concerns about side effects).

### D.     The ALJ did not err in considering Douglas's part-time work.

Douglas finally argues that the ALJ erred when she pointed to evidence of Douglas's part-time work at Farmers Furniture as supporting her determination that Douglas was not disabled. But the ALJ did not point to Douglas's part-time work at Farmers Furniture as per se evidence that Douglas could work. Instead, the ALJ found that Douglas's part-time work at Farmers Furniture was one of several daily activities that undermined Douglas's subjective pain testimony and Dr. Khusro's opinions. In considering Douglas's work at Farmers Furniture, the ALJ recognized that Douglas testified that she could take unscheduled breaks and had to miss 4 to 5 days a month. R. 1588. But the ALJ noted that Douglas's work activity report listed

no special accommodations made for her at Farmers Furniture, that Douglas's work there required her to work on a computer and "sit a lot," and that Douglas reported frequently lifting 10 pounds and sometimes lifting 20 pounds. *Id.* (citing R. 295–96, 309). So the ALJ found that Douglas's work at Farmers Furniture conflicted with the degree of limitations that she alleged. R. 1587–88. And, as discussed above, the ALJ found that Douglas's ability to work part-time was one of several daily activities that contradicted Dr. Khusro's opinion that Douglas cannot perform activities within a schedule, cannot be punctual within customary tolerances, and is easily overwhelmed. R. 1593.

The ALJ could consider Douglas's work at Farmers Furniture when assessing Douglas's credibility and evaluating the opinions of Dr. Khusro. *See Wolfe v. Chater*, 86 F.3d 1072, 1078 (11th Cir. 1996) (finding that mobile home washing work supported ALJ's determination that claimant's subjective complaints were not credible). And a reasonable person could agree that Douglas's work at Farmers Furniture, along with her other reported daily activities, undermined Douglas's subjective pain testimony and Dr. Khusro's opinions. So the ALJ did not err when she pointed to Douglas's part-time work at Farmers Furniture as supporting her disability determination.

## IV.    Conclusion

In summary, the court has reviewed the parties' briefs, the ALJ's findings, and the record evidence and finds that the ALJ applied the correct legal standards and that substantial evidence supports the ALJ's decision. So the court will **AFFIRM** the SSA's denial of benefits. The court will enter a separate final order that closes this case.

**DONE** this May 28, 2021.

_____
**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE